Public Utilities Commission
No. 87-075

### APPEAL OF CONCORD STEAM CORPORATION
### (New Hampshire Public Utilities Commission)

May 6, 1988

*Orr and Reno P.A.*, of Concord (*David W. Marshall* and *Cordell A. Johnson* on the brief, and *Mr. Marshall* orally), for the petitioner.

*Stephen E. Merrill*, attorney general (*Charles T. Putnam*, attorney, on the brief and orally), for the State.

BROCK, C.J. Concord Steam Corporation (hereinafter CSC or the company) appeals pursuant to RSA 541:6 from three orders of the public utilities commission (hereinafter PUC) in its docket DR 85-304. In the course of granting part of the company's requested rate increase to cover non-fuel costs, the PUC ruled on matters other than those relating to non-fuel costs. For the reasons that follow, we set aside all PUC findings on the propriety of certain fuel costs charged to ratepayers, and vacate, in part, the orders relating thereto.

CSC's PUC-approved meter rate consists of a base rate for recovery of non-fuel costs, and an energy cost adjustment (hereinafter ECA) rate for recovery of fuel costs. Pursuant to a 1983 agreement, the company moved to reopen an earlier rate-setting proceeding so that the PUC might consider the company's request for an increase in the base rate, for recovery of non-fuel costs, and an attendant increase in the meter rate to $9.05 per thousand pounds of steam. In its request, CSC did not seek any adjustment of the ECA rate.

After the PUC granted CSC's request for temporary rates at the $9.05 level, CSC requested a further base rate increase, and attendant meter rate increase to $10.00 per thousand pounds of

steam. The PUC set a temporary meter rate of $9.38 per thousand pounds of steam, and held hearings on the proposed permanent rate on June 3, 4 and 16, 1986.

Prior to the hearings, in mid-May, Daniel Lanning, the PUC's Assistant Finance Director, filed written testimony with the PUC and provided a copy to the CSC. In his prefiled testimony, which presented the PUC staff's recommendation on the company's permanent rates, Lanning expressed concern that, through the ECA component of its meter rate, the company had charged ratepayers improperly for certain fuel-related expenses. The basis for Lanning's concern was CSC's two agreements with Wood Fuel Production Company (hereinafter WFP).

On April 2, 1981, CSC had entered into an agreement with WFP for the purchase of wood fuel. WFP, which became operational on the same day, was a limited partnership whose aim was to set up a fuel processing center that would serve primarily CSC. CSC's president and sole shareholder, Roger Bloomfield, was a general partner in WFP with a ten percent interest that was subject to unilateral conversion to a limited partnership interest by the other general partner, a corporation. The corporate general partner, KIC Fuel Company, and the fourteen limited partners were associated with Lazard Freres & Co., the investment banker for CSC in the expansion of its steam system.

When WFP was unable to procure, at prices acceptable to CSC, the wood material necessary for producing wood fuel, CSC sought to terminate the purchase agreement. CSC and WFP executed an agreement, dated September 10, 1981, that terminated the purchase agreement and assigned to CSC WFP's interest in a contract for wood material that WFP had executed in August 1981 with Connecticut Valley Chipping Co., Inc. (hereinafter ConVal). In the termination agreement the company agreed to pay to WFP, during a five-year period, the larger of "an annual royalty on all wood or wood products used as fuel by Concord Steam from any source whatever," or "a royalty based on a deemed annual consumption of 72,000 green tons of wood or wood products, whether or not wood or wood products are in fact used as fuel." CSC itself has acknowledged that the royalties were designed to reimburse WFP for the unrecovered portion of its investment in the fuel processing plant.

Lanning's prefiled statement first expressed the PUC staff's belief that under RSA 366:3, which requires a utility to file with the PUC a copy of any agreement with an "affiliate," CSC should have obtained the PUC's approval of the purchase agreement with

WFP. Lanning noted that despite the apparently "interlocking directorates," the company had failed to notify the PUC of the contract.

Lanning next addressed CSC's payment to WFP of $73,440 for wood delivered during the test year ending December 1985. Because ConVal, and not WFP, was supplying the wood, the PUC staff considered CSC's payments to both WFP and ConVal to be duplicate payments for the same wood. The staff therefore recommended that CSC be required to refund to its ratepayers the $73,440 representing test-year royalty expenses recovered through the ECA rate.

During the subsequent hearings, CSC's agreements with WFP were not the subject of extended discussion. In his oral testimony, Lanning explained that the recommended disallowance of test-year royalty expenses would reduce slightly the figure for CSC's cash operating capital, and thereby affect the PUC's calculation of CSC's authorized base rate. Bloomfield testified briefly about the purchase and termination agreements, although the purchase agreement itself was not introduced into evidence.

In its brief filed with the PUC after the hearings, however, CSC addressed the WFP-related issues that Lanning had raised in his prefiled statement. The company provided a history of WFP and WFP's agreements with the company to illustrate, first, that WFP was not an "affiliate" of CSC and could not be deemed an affiliate simply because Bloomfield himself was an "affiliate," and, second, that the test-year royalties paid to WFP were not duplicate payments subject to refund but, rather, were a return of otherwise unrecovered investment. New Hampshire Hospital, a major CSC ratepayer, filed a brief in which it countered CSC's arguments and agreed with the PUC staff's recommendations.

In November 1986, the PUC issued an order that (1) rejected the CSC's requested meter rate of $10.00 per thousand pounds of steam; (2) approved a rate of $9.08 per thousand pounds of steam; and (3) directed the company to calculate and devise a means of refunding the excess revenue collected from ratepayers under the previously approved temporary rates. The accompanying report indicated that the PUC had omitted the test-year WFP royalty expenses in calculating the base rate and $9.08 meter rate. The report was not limited, however, to matters affecting the base-rate determination, but also contained findings on the company's agreements with WFP, and the resulting royalty payment expenses, thus implicating the ECA rate mechanism through which the company had recovered the royalty expenses.

In addressing the WFP agreements, the PUC first found that Bloomfield individually was an "affiliate" of CSC, but that the company had failed, contrary to RSA 366:3, to inform the PUC of the purchase agreement, and the PUC therefore had no occasion to become concerned about CSC's royalty payments until testimony in June revealed their purpose to reimburse WFP investors for net losses of some $400,000. While the PUC noted that the company's failure to file the purchase agreement, without more, would be a sufficient statutory basis for the PUC's disallowance of the estimated $400,000 in royalty expenses that the company would incur over five years, the PUC found that Bloomfield's imprudence in executing the purchase and partnership agreements provided an additional basis for disallowance. On the issue of Bloomfield's imprudence, the PUC found that (1) the purchase agreement omitted specifications for the fuel that WFP was to provide CSC, and (2), as a consequence of the carefully structured partnership agreement, Bloomfield lacked management control of WFP and, therefore, the ability to protect his and CSC's interests if the arrangement faltered.

Having determined that CSC improperly charged the royalty expenses to its ratepayers, the PUC concluded that a separate docket would be necessary to calculate the refund due ratepayers.

CSC filed a motion for rehearing or, alternatively, for a hearing in a separate docket to permit the company's presentation of additional evidence pertaining to its agreements with WFP. CSC asserted error in the PUC's suggestion that Bloomfield's "affiliate" status obligated CSC to file the purchase agreement, and error in the PUC's finding of Bloomfield's contractual imprudence without having the purchase agreement itself in evidence. With the motion, the company filed a copy of the purchase agreement. The PUC denied the motion for rehearing, citing the existence of ample support in the record for its findings, and the absence of information in the purchase agreement that would alter its prior decision.

In CSC's ensuing motion for clarification of the order denying a rehearing, the company again requested a separate hearing, asserting its entitlement to such a hearing under the due process clauses of the Federal and State Constitutions. CSC noted that the reasonableness of the royalty expenses, and other transactions with WFP, was a matter beyond the scope of the base-rate ratemaking proceedings, except insofar as the PUC might omit test-year royalty expenses in calculating cash working capital and the resulting base rate. The company asserted its lack of notice, prior to receipt of

the PUC's November 1986 report, that the PUC would determine, upon findings of impropriety, the issue of whether the CSC should refund all royalty expenses recovered through ECA rate charges. CSC supplemented the motion with an offer of proof, summarizing testimony that it would present at the requested hearing.

The PUC accepted the offer of proof but nonetheless denied the motion, stating that the additional information in the offer of proof did not invalidate the PUC's original findings of impropriety. The PUC observed further, in rejecting the company's due process claim, that (1) CSC had not objected to the discussion of royalties during the hearing, (2) CSC had indicated by its discussion of the WFP-related issues in its brief that it had received notice, (3) it was CSC's failure to disclose the purchase agreement that delayed the PUC's discovery of and questioning of CSC about the royalties, and (4) due process does not require advance notice of potential PUC findings in all instances, but is satisfied where the evidence supports the findings.

In this appeal, CSC challenges the PUC's findings that the royalty expenses were improper and therefore improperly charged to ratepayers. The company presents three issues, which we shall consider in turn. We note at the outset that although the PUC has not yet ordered refunds on the basis of its November 1986 findings, CSC properly challenges the findings now, rather than later when the company might be collaterally estopped to dispute them. The issues on appeal therefore are ripe for our consideration. Furthermore, RSA 541:13 limits our review in this appeal, and precludes our setting aside the PUC's decisions unless CSC demonstrates by a clear preponderance of the evidence that the orders or accompanying reports are unlawful, unjust, or unreasonable.

The company contends, first, that the PUC denied it notice and an opportunity to be heard on the propriety of the royalty payments, thereby violating its right to due process under the United States and New Hampshire Constitutions. We initially address the State constitutional claim and dispose of the due process issue on that basis if we find that the State provision affords adequate protection. *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 351 (1983).

■■ Where governmental action would affect a legally protected interest, the due process clause of the New Hampshire Constitution, N.H. CONST. pt. I, art. 15, guarantees to the holder of the interest the right to be heard at a meaningful time and in a meaningful manner. *See Appeal of Portsmouth Trust Co.*, 120 N.H. 753, 756, 758, 423 A.2d 603, 605–06 (1980). A fundamental requirement of the constitutional right to be heard is notice of the

impending action that affords the party an opportunity to protect the interest through the presentation of objections and evidence. *See City of Claremont v. Truell*, 126 N.H. 30, 35, 489 A.2d 581, 585 (1985); *Sununu v. Clamshell Alliance*, 122 N.H. 668, 672, 448 A.2d 431, 434 (1982).

■ While due process in administrative proceedings is a flexible standard, this court long has recognized that the PUC has important quasi-judicial duties, and we therefore require the PUC's "meticulous compliance" with the constitutional mandate where the agency acts in its adjudicative capacity, implicating private rights, rather than in its rule-making capacity. *Appeal of Public Serv. Co. of N.H.*, 122 N.H. 1062, 1073, 454 A.2d 435, 442 (1982). The PUC's due process obligation is apparent, moreover, in the statute delineating the agency's broad investigative authority, *see* RSA 365:5 and :19, 378:5, and in the provisions of the Administrative Procedure Act, *see* RSA 541-A:16, :18.

■ That CSC has an interest subject to the protection of due process is not in dispute, for this court has recognized a public utility's entitlement to a reasonable rate of return through its rates. *See New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95, 302 A.2d 814, 817 (1973). The issue we must address, therefore, is whether the PUC proceedings were constitutionally sufficient to protect that interest.

The record before us indicates that CSC received inadequate notice that the PUC would make findings on matters not germane in the base-rate determination, which findings would be conclusive in later proceedings. We concede that Lanning's prefiled statement, which referred to CSC's possible violation of the affiliate contract filing requirement, and to the possibility that the test-year expenses were duplicate payments subject to refund, was sufficient to inform CSC of the PUC's concern that the royalty charges might be improper. In the context of a limited ratemaking proceeding, however, Lanning's statement was sufficient to provide notice only that the PUC, in the ratemaking proceeding, might disallow the test-year expenses in calculating the base rate, and that the PUC, in a subsequent proceeding, might consider further the propriety of the royalty expenses.

CSC itself does not deny that the PUC provided the aforesaid limited notice. First, the company was aware that the PUC might disregard the test-year royalty expenses in calculating the base rate. It admits its consequent lack of incentive to produce substantial evidence on the propriety of the payments, given the

negligible effect that omission of royalty expenses would have on the determination of the base rate. The company further asserts that in addressing the royalty payments issue in the brief it filed with the PUC, it assumed that the PUC would commence a separate proceeding, if necessary, to consider the royalty payments issue for purposes other than base-rate calculation. In view of our conclusion that the PUC provided notice for limited purposes that do not include the determination of impropriety and a concomitant refund obligation, we hold that the PUC failed to provide CSC with constitutionally sufficient notice of the impending findings.

In the absence of adequate notice as to the impending findings on royalty payments, CSC had no reason to offer, and did not offer, the objections or evidence that adequate notice would have induced. The company, for example, did not introduce the purchase agreement into evidence at the hearings. The PUC's post-hearings acceptance of the agreement, moreover, was not a constitutionally sufficient substitute for full consideration in hearings and briefs. In making conclusive findings without affording the CSC a meaningful opportunity to be heard, the PUC thus failed to satisfy its obligation of meticulous compliance with the requirements of due process. *See Appeal of Public Serv. Co. of N.H.*, 122 N.H. at 1073, 454 A.2d at 442.

■ On the basis of the preceding analysis, we set aside the PUC's November 1986 findings that the royalty charges were improper, and vacate the orders denying rehearing and clarification. Because CSC does not challenge the base rate or attendant $9.08 meter rate that the PUC authorized in November 1986, we leave undisturbed the November 1986 report and order as they relate to the $9.08 rate. Finally, in view of our disposition of CSC's due process claim, we need not consider the company's federal constitutional claim, *see State v. Ball*, 124 N.H. at 231–32, 471 A.2d at 351, or the merits of the disputed findings.

*Findings and orders vacated in part.*

SOUTER, J., did not sit; the others concurred.