## In re PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Debtor.

### Bankruptcy No. 88–43.

United States Bankruptcy Court, D. New Hampshire.

May 17, 1990.

See also, Bkrtcy., 112 B.R. 49, 116 B.R. 344, and 116 B.R. 347.

---

Richard Levin, for Public Service Co.

Geoffrey B. Kalmus, J. Michael Deasy, for Unsecured Creditors Committee.

Richard N. Tilton, Howard J. Berman, for Equity Committee.

Harold T. Judd, Asst. Atty. Gen., Concord, N.H., Mark W. Vaughn, Manchester, N.H., for State of N.H.

Virginia A. Greiman, Wellesley Hills, Mass., U.S. Trustee.

George J. Wade, Barbara Gould Overend, for Citicorp and Consol. Utilities & Communications, Inc. (CUC).

Paul R. Gioia, Examiner.

George A. Hahn, Michael S. Schreiber, for Examiner.

John B. Nolan, Jeffrey G. Grody, Janice B. Grubin, Katherine A. Burroughs, for Northeast Utilities Service Co.

Victor Bass, Boston, Mass., for Maryland Nat. Bank as Indenture Trustee Co.

Paul A. Savage, Concord, N.H., for Pinetree Power, Inc., Pinetree Tamworth, Bio Energy.

Ted A. Berkowitz, New York City, for First Fidelity, Nat. Ass'n, New Jersey, Indenture Trustee.

Peter Nils Baylor, Boston, Mass., for Bank of New England, Indenture Trustee.

Robert Drain, New York City, for Shearson, Lehman, Hutton, Inc.

Paul R. DeFilippo, Newark, N.J., for Midlantic Nat. Bank.

Lawrence R. Katz, Boston, Mass., for Small Power Producers.

Bradford Paul Anderson, Newton, Mass., for New England Power Service.

Robert C. Richards, for Martin Rochman, Edward Kaufman, and Robert Richards.

Allen M. Rideout, pro se and for Allene L. Rideout.

Harry Saxon, pro se.

## TABLE OF CONTENTS

|       |                                         |          |
|-------|-----------------------------------------|----------|
| I.    | ISSUES AND RECORD                       | Page 822 |
| II.   | KEY FINDINGS AND CONCLUSIONS            | Page 823 |
| III.  | APPLICABLE LEGAL STANDARDS              | Page 825 |
| IV.   | THE SEABROOK INVESTMENT                 | Page 827 |
|       | Construction and Cost                   | Page 827 |
|       | Excess Cost Plants                      | Page 828 |
|       | The 1987 Write–Down                     | Page 828 |
| V.    | THE PLAN/COMPROMISE                     | Page 829 |
|       | The Plan Auction                        | Page 829 |
|       | The Plan Compromise                     | Page 829 |
|       | Price Paths/Charts                      | Page 830 |
|       | Phase–In Approaches/Limits              | Page 831 |
|       | Full Seabrook Recovery                  | Page 831 |
|       | One–Time 31 Percent Increase            | Page 831 |
|       | Off–Load Danger                         | Page 832 |
|       | Municipalization                        | Page 833 |
|       | Transmission Access                     | Page 833 |
| VI.   | LITIGATED RATE CASE                     | Page 833 |
|       | Commission Ratemaking/Process           | Page 833 |
|       | Return on Equity                        | Page 835 |
|       | Seabrook Rate Case/Delay                | Page 835 |
|       | Effects of RKR Proposal                 | Page 836 |
|       | GAAP/FASB Accounting                    | Page 837 |
|       | Other Seabrook Recoveries               | Page 838 |
|       | Other Nuclear Plant Recoveries          | Page 839 |
| VII.  | GENERAL CONCLUSION                      | Page 839 |

---

## MEMORANDUM OPINION ON "RKR" OBJECTIONS RE CONFIRMATION OF PLAN OF REORGANIZATION

JAMES E. YACOS, Bankruptcy Judge.

This Court by its "Order Confirming Third Amended Joint Plan of Reorganization" entered April 20, 1990 confirmed a $2.3 billion plan of reorganization in this case proposed by Northeast Utilities Service Company ("NUSCO"), Public Service Company of New Hampshire ("PSNH"), the Official Committee of Unsecured Creditors, the Official Committee of Equity Security Holders, Citicorp, Consolidated Utilities & Communications, Inc., and Shearson Lehman Hutton, Inc., (collectively, the "Proponents"), which plan had been filed by the Proponents on January 2, 1990 and was heard in a series of confirmation hearings spanning the period of April 4, 1990 to April 13, 1990.

The Confirming Order was supported by this Court's "General Findings of Fact and Conclusions of Law Re Plan Confirmation Issues" entered also on April 20, 1990 together with various supporting Memorandum Opinions dealing with various objections to confirmation and objections to

claims. The Court in dealing with the various objections in those pleadings effectively disallowed some $700 million in claims in this estate that were intertwined with objections to confirmation; dealt with a myriad of other objections including objections to the disclosure and voting procedures with acceptance of the plan of reorganization; and also denied the objections of three common stockholders, Martin Rochman, Edward Kaufman, and Robert Richards ("RKR") contending that a Rate Agreement compromise with the State of New Hampshire embodied in the plan of reorganization was not fair and equitable and that the "best interests" requirement of § 1129(a)(7) of the Bankruptcy Code was violated because the debtor could obtain greater value flowing down to the common stockholders by a litigated rate case with the State of New Hampshire.

The Court in dealing with the RKR objections made certain key findings on April 20, 1990, but due to the press of time in acting upon the pending plan of reorganization, deferred for further entry the setting forth of amplified findings and conclusions in support of the denial of these objections. This opinion therefore provides those amplified findings and conclusions in support of the Confirming Order. The RKR objectors have been granted an appropriate extension of time, to file any notice of appeal from the Confirming Order, to a date subsequent to the entry of this Memorandum Opinion.

## I. ISSUES AND RECORD

The issues raised by the RKR objections consumed most of the time during the confirmation hearings. While the record at times reads as though a utility rate case was going on before this Court it must be emphasized that notwithstanding the extensive testimony and cross-examination relating to rates, accounting methods, and rate-making procedures, the issue before this Court raised by these objections is *not* what actual rate orders would be issued by the New Hampshire Public Utilities Commission ("NHPUC") if this plan were not confirmed and a litigated rate case ensued, but rather whether the Rate Agreement embodied in the plan is a fair and equitable compromise in that regard under applicable bankruptcy reorganization case law and standards.

It also should be noted that considering the unique nature of this regulated public utility debtor, the Section 1129(a)(7) test of "best interests" is essentially the reverse side of the same "fair and equitable" issue, i.e., would common stockholders receive more net value if a chapter 7 trustee or any successor in interest conducted a litigated rate case with regard to the Seabrook investment.[1]

During the course of the confirmation hearings the Proponents put on a number of expert witnesses with regard to utility operations, accounting methods, and rate-making case procedures, to establish that the rates provided under the Rate Agreement in the plan were in fact fair and equitable in terms of what might come out of a litigated rate case. The RKR objectors put on no witnesses other than Mr. Richards himself. The case presented by the RKR objectors consisted primarily of extensive cross-examination of the witnesses put forward by the Proponents. The Court in this Opinion will refer to the testimony of the various witnesses put forward by the Proponents in those areas in which the testimony was found to be credible and persuasive notwithstanding cross-examina-

1. Technically, the Section 1129(a)(7) test would only require a showing—which is obvious here—that *liquidation* of the debtor would produce less value than a going concern *reorganization* under a plan. However, due to the unique circumstance that no termination of electric service to the public would be permitted in the disposition of the assets of this debtor in a chapter 7 proceeding, the Court has throughout these proceedings indicated that an alternative application of the 1129(a)(7) standard would be appropriate to protect creditors and stockholders. As stated in the Disclosure Statement "[T]he Bankruptcy Court has stated that in applying the best interests test in this case it also will compare the value achieved by the Rate Agreement with the value that might be realized by the Debtor under traditional rate-making principles in a litigated rate case if Seabrook were to operate." [Disclosure Statement, Court Doc. No. 2998, p. 70]

tion. In those areas in which a substantial dispute or question remains in the record the Court will so indicate.

## II. KEY FINDINGS AND CONCLUSIONS

For ease of reference beyond the foregoing incorporation by reference, this Opinion will set forth at this point the pertinent provisions of Paragraph 28 of the Confirming Order dealing with the objections to confirmation here in question:

> Each of the Objections to Confirmation that have been filed is hereby overruled.... This also includes without limitation the Objections filed by the common stockholders, Martin Rochman, Edward Kaufman, and Robert Richards ("RKR"), referred to in Paragraph 69 of the General Findings and Conclusions, contending that greater value could be realized for stockholders by a litigated rate case before the New Hampshire Public Utilities Commission as opposed to the compromise embodied in the Rate Agreement under the Plan. The credible evidence, however, supports a finding that PSNH could not recover substantially more under a traditional rate case than it would under the Plan because it is unlikely PSNH would recover significantly higher rates under a rate case. Even if PSNH were successful in obtaining higher rates, the impact of such rate hikes would likely lead to a loss of customers and loss of net revenue to PSNH, and ultimately to a lower return than that proposed under the Plan. Moreover, the expectable delay of approximately three years in obtaining the action by the NHPUC and the N.H. Supreme Court, with interest and other charges accruing to superior classes at approximately $176 million per year makes it even more unlikely that rate increases of a magnitude sufficient to overcome this "additional hurdle" to getting value down to the common could be achieved. The sum total of the evidence before the Court on this issue supports a finding—here made—that the rate increase results under the Rate Agreement represents a fair and equitable settle-ment and compromise well within the range of results reasonably expectable in a litigated rate case. The RKR Objection contending that a rate case would result in more value for the Debtor than that proposed under the Plan is hereby denied for the reasons set forth above.

Likewise, for ease of reference and incorporation, the supporting Findings and Conclusions included in Section G, Paragraph 60–70 of the General Findings of Fact and Conclusions of Law entered April 20, 1990, are set forth as follows:

### G. *1129(a)(7)*

60. Acceptance of the Plan by the impaired classes has not been unanimous. Therefore, the Plan must provide each holder of a claim or interest that has not accepted the Plan with an amount equal to or greater than the amount he, she or it would receive under chapter 7.

61. In determining the liquidation value of the Debtor, the Court will look first to the breakup value of PSNH. If the Debtor were sold in parts, the evidence in the record suggests that the value of the pieces is less than the Debtor's going concern value. As stated in the expert testimony presented by NUSCO's financial advisors, while some pieces of the Debtor might have value independent of their inclusion in an integrated electric utility, many of the Debtor's asset do not. In addition, if multiple parties bought pieces of the Debtor it is not clear who, if anyone, would bear the responsibility to serve the PSNH customers. Because of this uncertainty, it is highly unlikely that the State would permit the Debtor to be sold in pieces. If PSNH were sold in pieces, it would bring less than what is being offered under this Plan.

62. An alternative liquidation analysis of PSNH would be the value of PSNH sold as a going concern. The liquidation value of the Debtor as a going concern is found to be no higher than the value that is proposed under this Plan. This bankruptcy has been in effect an auction of PSNH, which has been highly publicized

and generated national attention and several substantial and serious bidders. Three utility companies with competent counsel and financial advisors competed actively to submit a winning plan proposal.

63. The significant publicity surrounding this bankruptcy has assured that any interested potential bidder was informed about this case. Interested bidders had many opportunities to negotiate with the Committees, the Debtor, and the State under the special procedures adopted by the Court for this unique case. The unusual problem of "valuation circularity" presented by a chapter 11 reorganization of a regulated monopoly utility company, and the special procedures employed in this reorganization case to deal with that unique problem, have been discussed at some length in prior opinions of this Court. See, e.g., *In re PSNH*, 88 B.R. 521 (Bankr.D.N.H. 1988); *In re PSNH*, 88 B.R. 546 (Bankr. D.N.H.1988); *In re PSNH*, 99 B.R. 155 (Bankr.D.N.H.1989); *In re PSNH*, 99 B.R. 177 (Bankr.D.N.H.1989); *In re PSNH*, 108 B.R. 854 (Bankr.D.N.H.1989).

64. The plan that ultimately succeeded in attracting the support of the Committees was the plan that offered the most value for the Debtor. A Commission of the Federal Energy Regulatory Commission has stated that this auction assured that maximum value was paid for the Debtor. Therefore, the Court finds that the liquidation value of the Debtor is no more than what has been offered for the Debtor in this Proposed Plan.

65. The Debtor would not command as high a price in a normal chapter 7 liquidation because of the value added to the Debtor by the Rate Agreement entered into with the State. This Rate Agreement provides certainty for the purchaser of the Debtor about rates than can be charged and, therefore, revenues that will be generated, without the delay and cost of litigation. A sale of the Debtor without the Rate Agreement would not command as high a price because the purchaser would discount the value of the Debtor to account for this uncertainty.

66. This Plan, therefore, provides more to the creditors than they would receive under a normal chapter 7 liquidation for the following reasons:

a. The liquidation value of the company in a chapter 7 would not be as high as it is for this chapter 11 Reorganization;

b. In a chapter 7 bankruptcy, there would be a significantly greater number and amount of unsecured creditor claims resulting from the rejection of contracts. In particular, rejection of the contracts with the small power producers alone would generate additional claims of more than $600,000,000. In addition, there would be the time element and administrative expense of a chapter 7 liquidation which would increase the administrative expenses of the bankruptcy and force the claim and interest holders to wait until the bankruptcy was concluded before receiving any dividend from the estate. Furthermore, interest on secured debt would continue to accrue.

c. In a liquidation, the Court finds that insufficient funds would be generated to pay the full amount of unsecured claims. There would be no distribution with respect to interests in a liquidation.

67. The suggestion that the State could take over the Debtor by eminent domain or otherwise, so as to preserve more value for the estate, is mere conjecture and speculation. There is no evidence that the State has any interest in taking over the Debtor. Even if the State had expressed such an interest, there is no legal authority or financing capacity for the State to take over the Debtor for a value greater than that proposed under this Plan. The New Hampshire General Court has recently passed a bill which would legislate the New Hampshire Energy Authority out of existence.

68. There is no reason whatsoever to conclude that the United States would ever take over the Debtor or Seabrook.

69. The final approach to liquidation and analysis of this decidedly unique Debtor—wherein it or its successor or successors in no event will cease to supply electricity to customers in New Hampshire—is to consider a non-normal liquidation scenario comparing the return to the estate under the Plan with the return the Debtor or its successors could expect to receive under a traditional rate-making proceeding for its interest in the Seabrook plant. The Court itself during the disclosure statement hearings and proceedings insisted this alternative be set out for the consideration of creditors and stockholders before they were called to vote upon the Plan. The objections to the confirmation filed by common stockholders Rochman, Kaufman and Richards ("RKR") generally raise this issue in the sense that they question the appropriateness of the Rate Agreement and compromise embodied in the Plan and argue that more value could be realized for shareholders if the Plan is denied confirmation and either the debtor-in-possession or its successors were authorized to pursue a litigated rate case before the NHPUC. This contention is considered and rejected in the confirming order entered separately this date. There is no requisite showing that the members of the impaired classes would receive more under a litigated rate case than is provided for them under the Plan. Section 1129(a)(7) therefore is satisfied under the alternative liquidation analysis approach as well.

70. The Court accordingly determines, in consideration of all the foregoing, that holders of claims or interests will receive under the Plan property with a present value not less than that they would receive under a chapter 7 liquidation of the Debtor under either a breakup value analysis, an auction style analysis, or a rate case analysis.

## III. APPLICABLE LEGAL STANDARD

The Supreme Court in 1968 set out the basic approach for a reorganization court in evaluating a substantial compromise involved as part of the plan of reorganization in *Protective Committee v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). The Court there reversed an order confirming a reorganization plan under chapter X of the prior Bankruptcy Act in that it found that the reorganization court had not exercised close enough judgment and review of the proposed compromise, sufficient to reach an informed view of the fair and equitable nature of the compromise. The Supreme Court set forth the basic standard to be followed in this situation as follows:

Compromises are "a normal part of the process of reorganization." *Case v. Los Angeles Lumber Prods. Co.,* 308 U.S. 106, 130 [60 S.Ct. 1, 14, 84 L.Ed. 110] (1939). In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts. At the same time, however, it is essential that every important determination in reorganization proceedings receive the "informed, independent judgment" of the bankruptcy court. *National Surety Co. v. Coriell,* 289 U.S. 426, 436 [53 S.Ct. 678, 681–82, 77 L.Ed. 1300] (1933). The requirements of §§ 174 and 221(2) of Chapter X, 52 Stat. 891, 897, 11 U.S.C. §§ 574, 621(2), that plans of reorganization be both "fair and equitable," apply to compromises just as to other aspects of reorganizations. *Ashbach v. Kirtley,* 289 F.2d 159 (C.A.8th Cir.1961); *Conway v. Silesian–American Corp.,* 186 F.2d 201 (C.A.2d Cir.1950). The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable. *In re Chicago Rapid Transit Co.,* 196 F.2d 484 (C.A.7th Cir. 1952). There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has

apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation. It is here that we must start in the present case.

When a substantial compromise is embodied in a reorganization which effectively "short-circuits" the formal provisions required for plan confirmation under chapter 11 of the Bankruptcy Code, the courts have not hesitated to apply the general requirements for evaluating compromises in reorganization proceedings as first announced in the *Anderson* case. See, e.g., *In re Continental Investment Corp.*, 642 F.2d 1, 4 (1st Cir.1981); *In re Emerald Oil Company*, 807 F.2d 1234, 1239 (5th Cir.1987); *In re American Reserve Corp.*, 841 F.2d 159, 162 (7th Cir.1987); *In re A & C Properties*, 784 F.2d 1377, 1382–83 (9th Cir. 1986); *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1158–59 (5th Cir.1988); *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir.1989). Indeed, the policy underlying the application of this standard is so strong that it has been held to apply equally to *pre-confirmation* compromises presented during the course of reorganization proceedings under the Bankruptcy Code. *In re Aweco*, 725 F.2d 293 (5th Cir.1984) cert. denied, 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

The Court of Appeals for the First Circuit has noted that there have to be some limits as to the degree of detail on the underlying controversy that must be examined by the trial court before considering approval of the compromise and settlement. The Court of Appeals stated in *Greenspun v. Bogan*, 492 F.2d 375, 381 (1st Cir.1974) the following:

The settlement might not be so favorable to CMI as would a final judgment on the merits. But any settlement is the result of a compromise—each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court, in reviewing a settlement proposal, need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial. *See United Founders Life Ins. Co. v. Consumer's National Life Ins. Co.*, 447 F.2d 647 (7th Cir.1971); *Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir.1960).

Bankruptcy Rule 9019 establishes the discretionary power of a bankruptcy court to approve or disapprove compromises or settlements. It has been held that in the exercise of that discretionary power it is not necessary for the bankruptcy court to decide questions of law or fact raised by objectors. *In re Teltronics Services, Inc.*, 762 F.2d 185 (2d Cir.1985).

The reorganization court in *In re Texaco Inc.*, 84 B.R. 893 (Bankr.S.D.N.Y.1988), appeal dismissed, 92 B.R. 38 (S.D.N.Y.1988), was presented with the question of confirmation of a plan of reorganization which included within itself a compromise of a judgment claim held by a creditor, Pennzoil, in the amount of $11.3 billion for a settlement amount of $3 billion pursuant to the plan. The court approved the compromise as part of the confirmation of the plan of reorganization and noted [84 B.R. at 902] the following:

(1) The balance between the likelihood of plaintiff's or defendants' success should the case go to trial vis a vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.

(2) The prospect of complex and protracted litigation if the settlement is not approved.

(3) The proportion of the class members who do not object or who affirmatively support the proposed settlement.

(4) The competency and experience of counsel who support the settlement.

(5) The relative benefits to be received by individuals or groups within the class.

(6) The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement.

(7) The extent to which the settlement is truly the product of "arms-length" bargaining, and not of fraud or collusion.

See *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983), cert. denied, sub nom; *Casoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

## IV. THE SEABROOK INVESTMENT

### *Construction and Cost*

PSNH began construction of a nuclear power plant at Seabrook, New Hampshire after receiving a siting certificate in 1974. PSNH was the lead utility with regard to the Seabrook project, originally holding 50 percent of ownership of the proposed plant along with a number of other joint owners compromising the major utilities in New England. PSNH's original ownership interest was reduced to 35.6 percent by various agreements and sales involving the other joint owners in the early 1980s.

The Seabrook plant was originally planned as a two-unit nuclear power plant (having two nuclear reactors) with a projected total cost of approximately $1.3 billion with completion projected for Unit I for November of 1979. On May 7, 1979 the State of New Hampshire enacted legislation (commonly referred to as the "AntiCWIP" law) which prohibited any recovery in rates for any construction costs expended by a utility in construction of a plant until such plant was actually on line producing power commercially. [RSA § 378.30–a] Notwithstanding this development, which in effect substantially increased the cost of completion of the Seabrook plant (due to the need to borrow

money at interest to cover the cost of completion until the plant could go on line) PSNH management and the other joint owners determined to proceed with completion of the Seabrook plant.

As events turned out, only one unit of the plant was completed and that did not occur until October of 1986. Since that date, due to various delays in getting a full operating license from the Nuclear Regulatory Commission, and the delay in these chapter 11 proceedings which were commenced on January 28, 1988, the total cost of the Seabrook plant with all carrying costs and interest charges as of January 1, 1990 is approximately $6.5 billion. Of that total investment, the amount invested by PSNH itself as a joint owner, as of January 1, 1990, was approximately $2.9 billion.

It is this greatly escalated cost of the Seabrook plant, and the ultimate inability of PSNH to borrow sufficient monies to cover its public debenture debt incurred in financing the construction of the plant until it could go on line, that led to the chapter 11 petition filed by PSNH on January 28, 1988. The NRC finally issued a full operating license on March 1, 1990, and the Seabrook plant is expected to proceed into commercial operation within the next few months. An appeal from the NRC decision is pending.

The chapter 11 filing followed by two days a decision by the New Hampshire Supreme Court not to permit "emergency" rate increases necessary for covering pressing PSNH public debt payments in the face of the Anti-CWIP statute. See *Petition of Public Service Company of New Hampshire*, 130 N.H. 265, 539 A.2d 263 (1988). The same escalated Seabrook plant construction and delay costs, and the question of how much of those costs would be recoverable in a litigated rate case before the New Hampshire Public Utilities Commission, is at the nub of the RKR objections to confirmation. The Confirmed Plan provides in effect for recovery of between $1.4 billion and $1.54 billion (depending on various contingencies) of the $2.9

billion that PSNH invested in the Seabrook plant.

### Excess Cost Plants

It was no secret during the 1980s and before that utility companies throughout the nation were having trouble getting full recovery of their investments in "excess cost" power plants. This development had to do primarily with regard to *nuclear* power plants that had precipitated unprecedented controversy and delay due to citizen groups asserting various safety and environmental concerns. Articles appeared in the professional literature regarding this novel problem for regulated utilities. Such utilities had been accustomed during the earlier decades of this century to almost automatic recovery of costs expended for new plants from the various state regulatory commissions. See e.g., Pierce, "The Regulatory Treatment of Mistakes in Retrospects: Cancelled Plants and Excess Capacity", 132 U. of Pa.Law Review 497 (1984); Goldsmith, "Utility Rates and 'Takings' ", 10 Energy Law Journal, 241 (1989). See also, general discussion of "two tumultuous decades" for electric utility companies in an article by Charles M. Studness, "The Electric Utilities During the 1970s and 1980s," Public Utilities Fortnightly, Vol. 125, pp. 40–47 (February 15, 1990).

The phenomenon of the "white elephant" nuclear power plant, with costs so high that utility rates to customers would have to reach unprecedented levels to recover such costs, was not a topic restricted to professional journals. The *Wall Street Journal* in an Op–Ed article on October 9, 1984, entitled "Whom to Soak When Utilities Take a Bath?" led the article with a paragraph stating: "Electric Utilities' construction costs, mainly for nuclear plants, have mushroomed into a multi-billion dollar cloud of doom over the industry." A later lead article on October 2, 1986, on page one of the *Wall Street Journal*, was entitled: " 'Prudency Reviews' Are Changing the Way Utilities Set Rates: Regulators' Scrutiny Results in Big Cost Disallowances for Some Nuclear Plants."

### The 1987 Write–Down

Robert M. Busch, Senior Vice President of Finance and Chief Financial Officer of Northeast Utilities, testified that the PSNH board properly wrote down Seabrook in early 1988 (for the 1987 year financial reports) and that that accounting decision was appropriate at the time. The PSNH write-down was approximately $1 billion of a $2.9 billion investment. It was based essentially on the "unreasonable possibility of full recovery" of Seabrook's costs. Many other utilities had to write-down nuclear power plant costs—even before regulators required it. The witness himself did it for NUSCO for its Seabrook share ownership two years ago. The PSNH change in accounting was shown at page 38 of its Form 10K Report to the SEC for the 1987 calendar year.

PSNH's cost per Kilowat ("KW") hour was 8 cents at that time. It would be 16 cents if all Seabrook costs were recovered with approximately a 89 percent one-time increase. The general rates in New England run about 7½ cents on average. PSNH clearly could not charge 16 cents without suffering substantial defections by commercial and industrial users. Management realized the severe ramifications of the 1988 write-down of Seabrook on the books of PSNH. They realized that would lead the NHPUC to claim that amount as a cap in any rate litigation. But they determined that they couldn't recover more than $1.8 billion and that continuing to carry the full Seabrook costs on the books would be misleading to investors. The change was made on their general financial statements.

PSNH did *not* change the Form 1 (the so-called "regulatory books" submitted to various regulatory agencies) because they wanted to preserve higher value for Seabrook power if that power became more valuable in the future (for example, if oil prices escalated again) and higher value also contingent upon the appeal then pending in U.S. Supreme Court. The Form 1 is filed with FERC as well as with NHPUC.

Bruce W. Wiggett is the comptroller of Public Service Company of New Hampshire. Wiggett testified that Assistant At-

torney General Larry M. Smuckler (now Chairman of the NHPUC) stated during the negotiations on the plan of reorganization that PSNH would never recover more than the $1.8 billion that management had indicated was recoverable.

The Examiner appointed by the Court in this proceeding, Paul L. Gioia, who served as Chairman of the New York State Public Service Commission during most of the 1980s, also indicated that the *fact* of the 1987 write-down would be given serious weight in a regulatory proceeding as to the upper limits of cost recoveries even though the write-down would not be *legally binding* upon a regulatory commission.

Andrew B. Herf is a partner in the Accounting and Auditing Group of Arthur Andersen and Company. He has worked for that company for about 20 years. His specialty is the public utility area. Herf testified at length about the 1987 write-down by PSNH management. [See Transcript, Court Doc. No. 3722, pp. 246–269] He noted that PSNH in its 1987 write-down eliminated equity items and replaced "regulatory interest" with "commercial interest." This amounted to an approximate $1 billion reduction to a $1.8 billion asset value for Seabrook. To Herf, the fact that management did not continue to capitalize interest after the write-down (although they had done so before and could have continued to do so under accepted accounting principles) meant that management felt that the $1.8 billion was a *ceiling*. Herf testified that one reason management could know in 1988 that they couldn't get the other $1 billion out of Seabrook was simply that Seabrook at a $6,000 to $7,000 KW capacity cost was not economic when compared to capacity costs of other plants running in the $2,000 to $3,000 per KW range. Herf testified that if that were true in 1987, it is even more true today with a more intense competitive environment.[2] Under the plan the KW capacity cost would be approximately $3,500.

2. At the conclusion of the Disclosure Statement process in November of 1988, the court required the debtor to indicate the maximum it would seek in a litigated rate case—for disclosure purposes on the range of results regarding the com-

## V. THE PLAN/COMPROMISE

### The Plan Auction

Robert M. Spann is a senior consultant for Charles River Associates, an economic and management consulting firm with offices in Boston and Washington, D.C., as well as a lecturer in economics at George Washington University. His area of expertise is regulatory economics and finance and high thrust economics and statistics. He has a B.S., a Masters, and a Ph.D in economics from North Carolina State University. Spann testified that in view of the "auction" of PSNH which occurred during the course of these reorganization proceedings, by virtue of the multiple competing plans filed, if the company were worth more "with the rate case to go forward" another buyer would have come in and offered more under "market" conditions.

John F. Curley is managing director in the Merchant Banking Department of Morgan Stanley, an investment banking firm. He has worked with that company since 1978. He has a B.A. and MBA from Dartmouth College. Curley testified that the NUSCO plan offered the highest value available in view of the fully publicized auction process over a clearly sufficient time period of two years to attract market interest and in view of the fact that four legitimate bidders (all being substantial regional utility companies) did enter the bidding process.

### The Plan Compromise

Seabrook is valued in the plan at $700 million, plus an "acquisition premium" of another $700 million, for a total $1.4 billion in Seabrook value. The calculations with regard to value according to Curley are $2.3 billion in plan value, comprised of $900 million for assets other than Seabrook and $1.4 billion of Seabrook costs to be recovered. The Seabrook recovery however

promise—and Mr. Levin for the debtor stated in open court that the company would not seek more than $1.8 billion in recovery of Seabrook costs in a litigated rate case.

could be up to $1.54 billion depending on other variables and contingencies. The Rate Agreement, which includes the Seabrook recovery, was negotiated constantly up to the final NUSCO plan being joined in by the committees. There was no agreement on rates before a plan agreed to by the major parties was presented.

Curley testified at length as to the $2.3 billion in values intended to be realized under the NUSCO plan. He also testified as to the step 1 and step 2 implementation procedures with regard to the plan. Under the plan, NUSCO would need to raise an initial $458 million in cash on the effective date and has $300 million of that already committed. A total of $1.357 billion to $1.457 billion will ultimately be required to fund all cash payments under the plan.

Morgan Stanley is "highly confident" that it can sell the securities on the rates and terms indicated to fund the plan under both steps. It has given a letter to that effect. The Rate Agreement is essential to confidence in the markets to purchase the securities according to Curley. It is critical in that regard that the seven years of fixed rate path and three years of additional stability in rates under the Rate Agreement be available for marketing the securities. Moreover, the return on equity "collar" included in the Rate Agreement gives additional comfort in that no one can predict everything that may occur over 10 years and the collar, in effect, protects against items that might have been missed in the projections for all sides.

Curley also testified at length as to feasibility and performance by the reorganized debtor under the plan, including the strong management regarding nuclear plants and the excess wintertime capacity and other synergies that NUSCO "brings to the table" as additional value under the plan.[3] He testified that the value attributable to the equity holders, Classes 11, 12 and 13, would range from $170 million to $500 million depending on various contingencies. He testified further that both the Official

Committees and the State of New Hampshire wanted to litigate the rate case initially but finally decided that a negotiated rate agreement was in the common interest. Curley was actively engaged in the negotiations for NUSCO.

Wilber L. Ross, Jr., is employed by Rothschild Inc. He has been involved in many large bankruptcy reorganization cases in the United States as a financial advisor to a major party in interest. He has a B.A. from Yale University and an MBA from Harvard University. Ross testified for NUSCO regarding the difficulty in the negotiations that led to the consensual plan. Ross was the investment banker retained by the Equity Committee. Essentially, the negotiations ultimately resolved down to "give-ups" by various senior interests to let value go down to the equity holders. These items included $218 million in post-petition interest claims given up by the unsecured creditors and $145 million of pre-petition dividends and $99 million of post-petition dividends by the preferred shareholders. The Equity Committee was the principal party threatening a litigated rate case in the negotiations.

### Price Paths/Charts

Peter Fox–Penner is the Vice President of Charles River Associates. He has a B.A. in electrical engineering from the University of Illinois, a Master's in mechanical engineering from the University of Illinois, and a PhD in economics from the University of Chicago. His doctoral dissertation, and other post-graduate publications have concerned electric utility regulation. His specialty at Charles River Associates is electric utility matters. His clients are national in scale. He testified as to the calculations on a "price path" and an "equilibrium price path." The latter concept examines a sequence of prices over time to include consistency in price/revenue planning in terms of actual revenues to be collected.

Penner prepared and identified the two charts (NUSCO Exhibits 8 and 9) which

---

**3.** NUSCO's peak load, due primarily to air conditioning, occurs in the summer; the peak load of New Hampshire, due primarily to skiing, occurs in the winter. This Court rejoices in being on the right side of *that* particular synergy.

illustrate the range of utility rates in New England with a black line on Exhibit 8 representing the price path under the reorganization plan. The black line is in the red band (the top 20 percent of the chart) until 1997. The plan prices therefore are higher than the prices charged to 80 to 90 percent of all other electric power customers in New England. [Transcript, Court Document No. 3672, p. 176] The price path on the chart does take into account expected losses to self-generation, fuel switching, and the resulting lower use of electricity.

The second (broken) line on Exhibit 9 shows RKR's idea of a maximum "constitutional rate path" in the view of witness Spann. This shows 18–cent to 19–cent rates as opposed to a New England average of 7½ cents. Actually, the RKR rates would be 16 to 17 cents but the witness assumed loss of sales from the high rates so raised the rates necessary to actually collect the entire $2.9 billion of Seabrook costs.[4] The chart does not consider municipalization dangers.

The top of the red band on chart Exhibit 8 is *not* the breakpoint which would cause a death spiral of ever increasing defections from the system prompting still higher rates causing further defections. Rates could go appreciably higher if allowed by the NHPUC. When rates do go too high, however, the "death spiral" means that you not only lose the increased rates, but *all rates* from customers who go off the system.

### Phase–In Approaches/Limits

In Spann's view "phase-in" approaches, while ameliorating the "rate shock" impact by allowing lower initial rates for a Seabrook recovery, just mean that "you collect larger dollars later rather than now." Spann testified that "phase-ins" have benefits *and* costs, i.e., there is no such thing as free lunch.

### Full Seabrook Recovery

Busch testified there is no reasonable way that the $2.9 billion cost of Seabrook could be put into a rate base in view of competitive pressures and other economic considerations. A phase-in would ultimately require *more than* $2.9 billion in recovery. Spann testified that if you tried for a $2.9 billion recovery over 10 years, you would probably start at about 13 cents early on but by mid-decade rates would go over the line and above 20 cents. This assumes the 10–year maximum phase-in period that accountants require. PSNH at the time of the 1987 write-down of Seabrook estimated a one-time rate increase of 130 percent would be necessary for recovering Seabrook costs. That increase currently is estimated at 89 percent. The drop from 130 percent to 89 percent regarding the increase to recover Seabrook costs was related, among other things, to lower fuel oil costs under current market conditions; the fact that the cost of equity variable dropped significantly during the time period after 1987; and that the net revenues were up and other asset values fluctuated.

### One–Time 31 Percent Increase

The RKR objectors rely heavily on the reference in the Disclosure Statement (p. 73) to the Bower–Rohr Study (Bower Rohr & Associates) commissioned by the debtor in early 1989 stating that a one time rate increase of 31 percent, plus yearly inflation increases thereafter, would be affordable. The reference indicates that the "normal" rate increase discussed would be an average and assumes the actual increases would vary among customers classes.[5] Rates now charged are approximately 9 cents per KW hour.

An increase of 31 percent the first year and then increases with inflation assumed to be 4 percent per year would result in high rates existing nowhere in New Eng-

---

4. The RKR objectors argue that they would use a long-term "phase-in" of the Seabrook higher recovery and could ameliorate the indicated rate shock. However, this long-term proposal encounters significant other problems discussed below.

5. There is no indication in this record as to how such increases would vary, i.e., how or whether existing "rate design" practices of the NHPUC would be changed.

land except on "islands" or "peninsulas" having special requirements. The prices would be 12 cents at the outset. Wiggett recognized the Bower–Rohr study indicated a 31 percent rate increase would be bearable, but he expressed the opinion it was not feasible due to economic and political realities and the uncertainties as to the actual effects of such an increase. The Business and Industry Association for one would react to such an increase as "absurd" and has indicated that more than a five percent increase in rates will induce industry to leave New Hampshire.

The Bower–Rohr Report discussion of a rate increase of 31 percent is before the court only in terms of the brief discussion of the Report that is included in the Disclosure Statement. The report is not in evidence before the court nor were witnesses called by the RKR objectors to testify directly as to the conclusions reached.[6]

### Off–Load Danger

David E. Kleinschmidt is a senior consultant in the Engineering Science Section of Arthur D. Little, an international planning and technology consulting company. He has worked for this company since 1976, and specializes in utility and power generation technology. He has a B.A. in chemical engineering from MIT, and a Master's from MIT. He has particular expertise with regard to power-generation, co-generation, and self-generation matters.

Kleinschmidt conducted a survey and interviews with substantial commercial user candidates during the period between November 1988 and January 1989 with a follow-up in March of 1990. They involved some seventeen likely candidates for going off the system.

Kleinschmidt testified at length as to his study; ran a model with a ten-year simulation; discussed generation systems "easily purchased"; and the marketing effects going on in New Hampshire currently

in that regard. He testified that significant self-generation is already occurring in New Hampshire and that it would be a serious threat with greatly increased electric rates.

Kleinschmidt testified further as to other factors involved and noted that the *perception* of where electric rates are going is very important—more so than the actual current rates. From his survey, he noted that companies who are likely candidates for self-generation or co-generation are largely aware of the reorganization case and are waiting to see what happens. He found that they have already crossed the "psychological barrier" and so would be ready to decide on self-generation rapidly and implement the same in the face of substantial rate changes.

Kleinschmidt testified that the loss of demand over 10 years due to the increased rates would be approximately 45 MGW; or in other terms lost sales of 280,000 MGW hours per year. This translates to a loss of 1½ years of growth. He testified that the large commercial customers were the most likely to go off the system and that you would not only lose their revenues but those customers typically cost less to service so you have a doubly negative economic effect. Presently, there is some 50 MGW in capacity by co-generation of industrial customers of PSNH. There is at least that much capacity in self-generation and considerably more if waste-to-energy plants are included.

The Examiner's questions to Kleinschmidt suggested that changes in "rate design" (i.e. reducing the higher, subsidizing rates typically charged industrial customers) could cut down the off-load danger of higher rates. The witness did not think the off-load danger here could be covered by that device. Moreover, disturbing the rate design subsidy pattern would *probably provoke a violent legislative reaction*.[7]

6. The Bower–Rohr 31 percent reference in the Disclosure Statement is a fact but was put there by Court direction only to alert equity holders to the alternative arguments as to bearable rates. It was there for voting purposes only. It

is not independent evidence that such rates would be collectable.

7. It is noteworthy that in the recent "PSNH legislation" concerning the Rate Agreement that the New Hampshire legislature took special care

Curley also testified, with regard to the off-load danger, that you don't *lump* all customers in this type of analysis, since you would lose the *most profitable* customers and also lose the more *dense* load as well.

### Municipalization

William G. Moss is Vice President of the Energy Group at Charles River Associates, where he has been employed for six years. He specializes in microecomonics, statistics and econometrics with a focus on energy and other regulated industries. He has a B.A. and Ph.D in economics from the University of California at Berkeley.

Moss has studied municipalization and did a study of municipalization attempts during 1970–1989 and found 79 such attempts. He concluded it was a viable option in New Hampshire but probably would not occur under the NUSCO plan. It would probably occur at a 1½ to 2 cent per KW hour increase.

Of the 79 municipalization attempts that Moss studied, 20 resulted in municipalization and 23 are still pending. Of the 20 that succeeded, they tended to involve small municipalities of up to 10,000 customers. However, major municipalization attempts are pending with regard to New Orleans and Chicago.

Wiggett, the controller of PSNH, testified regarding the studies done in Nashua, New Hampshire in 1987 and 1988 considering possible municipalization. The city put the matter on hold pending the bankruptcy resolution. The third broken line on chart Exhibit 9 shows the effects of a hypothetical municipalization of Nashua, New Hampshire. The rates literally "go off the chart" under that scenario. The resulting twenty cent rates would mean PSNH would suffer a serious loss of its most profitable business.

On cross-examination, Wiggett admitted that gain from a sale of utility property due to a municipalization would go to the bottom line for investors but "in the long

run it would not be good because the company would be losing revenue from a lot of customers."

### Transmission Access

Penner testified that you can't effectively charge more than *costs* for a transmission access because of NHPUC and FERC regulatory policies fostering competition. A newly-formed utility company serving Concord and Exeter, New Hampshire, in fact did recently go off the PSNH system and forced PSNH to run other purchased power through PSNH's lines at cost after a proceeding before the NHPUC.

## VI. LITIGATED RATE CASE

### Commission Ratemaking/Process

During the course of the hearings the Court requested that the State of New Hampshire file a non-adversarial memorandum of exposition setting forth the basic procedures and principles with regard to ratemaking and rate cases under New Hampshire law. That memorandum, filed April 11, 1990 as Court Document No. 3572, with certain non-material deletions, is excerpted and attached as an Annex to this Opinion. The Court also received a Supplemental Report from the Examiner on this matter, filed April 6, 1990, as Court Document No. 3455. As noted above, the Examiner himself has served as Chairman of a major state public utility commission. The following extracts from the Examiner's Supplemental Report, which extracts I deem to be non-adversarial in this context, are useful in setting forth the general principles and procedures relating to ratemaking for regulated monopoly public utility companies:

> For ratemaking purposes, a utility's costs are broken down into two basic types, operating expenses and capital costs. An operating expense is generally defined as a good or service which will be consumed by the utility within one year. These include costs such as fuel, labor,

to forbid any altering of rate design by the reorganized company without approval by the legislature itself. See N.H.R.S.A. 362–C:8 (December 18, 1989), which is attached as Exhibit G to the Disclosure Statement.

insurance and taxes. While not readily apparent, depreciation is included as an operating expense since it represents one year of economic wear and tear on the utility's equipment.

Capital costs are the costs associated with financing the utility's investment in assets that provide service to the public. The "rate base" is made up of utility assets that will provide service for more than one year. The value of these assets is generally calculated on the basis of prudent original cost less depreciation, and is limited to assets that have been financed by funds provided by utility investors and not other sources (such as customer deposits or tax benefits).

Once the rate base has been established, the PUC must determine the "rate of return" that the utility should earn on the rate base. The cost of debt securities is relatively easy to determine since they usually carry a fixed rate of interest. The same is generally true for preferred stock. The cost of common equity invested in the utility, however, is more difficult to ascertain, since for most utilities the return demanded by common stockholders is determined by the financial market and is constantly changing.

\* \* \* \* \* \*

The ratemaking process may be expressed as a simple formula: "R = O + (B × r), where R is the utility's allowed revenue requirement; O is its allowed operating expense; B is its rate base, defined as cost less depreciation of the utility's property that is used and useful in the public service, ... and r is the rate of return allowed on the rate base." *Appeal of Conservation Law Foundation of New England, Inc.*, 127 N.H. 606, 633–34, 507 A.2d 652 (1986) (citations omitted).

\* \* \* \* \* \*

A PUC usually operates pursuant to a broad statutory authorization with a general mandate to establish "just and reasonable" rates [see RSA 374:2; 378.] without specific direction as to how that is to be accomplished. PUCs normally adopt extensive rules and regulations, within the broad framework of their statutory authorization, that govern their regulation of utilities. PUCs also develop policies with respect to specific issues relating to utility regulation. The regulations and policies adopted by a PUC are subject to change whenever the PUC concludes that the public interest so requires.

In the early days of utility regulation, legislatures set rates for utilities, including railroads and early gas and electric companies. That approach proved unsatisfactory for many reasons, including the perception that utilities had gained undue influence through the lobbying of legislators and that the legislative process is not well-suited for dealing with the complex issues related to utility regulation.

The rate setting process is often referred to as a legislative function, reflecting the fact that it was originally exercised by legislatures before being delegated to PUCs. The rate setting function is also referred to as legislative, as distinguished from judicial, to indicate that PUCs have broad discretion and, unlike judicial officers, are not disinterested arbiters between contesting parties, but represent the public and have a direct responsibility to protect the public interest in safe and adequate service.

Ratesetting, however, is also referred to as "quasi-judicial", which reflects the fact that PUCs' administrative proceedings have become relatively formal and parties who appear before them are expected to be accorded a fair hearing and reasonable treatment. Furthermore, PUC ratesetting decisions must be based on the record developed in a proceeding, and are subject to judicial review. Judicial review, however, is limited and the courts are required to respect the broad discretion and expertise of the PUC.

The record includes considerable discussion as to why we have regulatory commissions with regard to electric power companies and regarding the "legislative nature" of the NHPUC as one aspect of its activities. Busch testified that commissions were created not simply to insulate from

political pressures, but primarily because the subject was "too arcane" for the legislature to deal with. He agreed that utility regulators have great flexibility but noted that they still have to exercise that discretion on a record and not arbitrarily. Busch testified that regulatory discretion is always a risk but there is more risk "if 420 legislators are doing it."

Curley testified that there are "tons of subsidies" (also expressed as a "plate of spaghetti") in the way utilities are regulated by PUCs, i.e. the PUC tends to allow "the farmer at the end of the line" to get electricity at affordable costs by in effect requiring other customers to subsidize some of that cost. PUCs simply would not allow dumping of all of the costs of the customers that go off the system upon the "little people" who *have* to take electricity no matter what it costs.

Wiggett has been involved in many NHPUC proceedings and testified emphatically that the process is not a simple equation with the "four factors" set forth in the literature. The company has the burden and must put on persuasive evidence; competition is a factor; and the company "cannot price itself out of the market."

Herf testified that you cannot predict exactly what PSNH would get in a rate case but that the $2.3 billion company value under the plan is within the reasonable range of outcomes of a contested rate case. Herf also testified that the rate arena and the regulatory-political environment the utility is in *has* to be considered with regard to rate cases and rate levels.

### Return on Equity

Busch testified regarding how return on equity is determined, including a discussion of "forcing shareholders to sell stock below book value." Richards cross-examined Spann at length regarding the debt-equity ratio testimony and cost and return on equity calculations, etc. The return on equity level for PSNH in 1986–87 pursuant to PUC orders was 15 percent. Wiggett agreed with Richards' point that return on equity can be defined as the return that must be paid to induce common stockholders to buy stock at a price above book value. The concept of "dilution" therefore means selling shares below book value. Wiggett testified however that "dilution" was not a factor in any rate case with which he has been involved. Herf testified that there are many, many ways to calculate return on equity.[8]

### Seabrook Rate Case/Delay

Seabrook is the most expensive nuclear plant ever built, for its capacity, and probably would result in a write-off of 50 to 60 percent in a litigated rate case, according to the testimony of witness Spann. He also testified that PUCs nationally are requiring a "performance clause" even when nuclear power plants are allowed into the rate base. The objective is to be able to suspend cost recovery when, as often is the case, the plants are not operating due to various problems. If the NHPUC required this in a Seabrook rate order, even assuming the higher recovery in a litigated rate case under the RKR assumptions, the company would be back in the bankruptcy court when Seabrook had its first operational problem, although it purportedly would have a right to recover all its Seabrook costs. It was obvious according to Spann that if Seabrook costs two to three

8. A leading treatise echoes this thought and the "circular question" problem that has been endemic to this reorganization case: "The most difficult problem in determining the overall cost of capital arises in estimating the cost of equity capital. The relevant question is: How much must a utility earn to induce investors to hold and to continue to buy common stock? In answering this question, it is important to realize that circular reasoning is involved. In the absence of a fixed, expressed, or implied commitment as to the dividend rate, the actual cost of floating a stock issue is indeterminate. Investors' decisions are largely based on a utility's expected earnings and upon their stability, as well as upon alternative uses of investment funds. Yet, since the allowable amount of earnings is the object of a rate case, a commission's decision, in turn, will affect investors' decisions." Phillips, *The Regulation of Public Utilities*, p. 375, Pub. Util. Reports, Inc. (1988); Cf. also the "Between Scylla and Charybdis" reference by Justice Holmes in *Cedar Rapids Gas & Light Co. v. Cedar Rapids*, 223 U.S. 655, 669, 32 S.Ct. 389, 390, 56 L.Ed. 594 (1912).

times more than any other plant the PUC would look at that as a factor in determining rates.

Ross calculated $2.68 billion in claims ahead of the common stockholders in the absence of a consensual plan as of the time of the confirmation hearings. Accordingly, if the plan is not confirmed, the litigated rate case would have to produce $2.68 billion in total company value, plus $176 million per year until a new plan could be confirmed before distributions made under a new plan could reach down to common stockholders after covering the full rights of the senior classes. The $176 million a year is comprised of $135 million per year accruing on post-petition interest on the unsecured claims and $41 million per year on post-petition dividends to the preferred shareholders.

Wiggett testified that he didn't believe that the company would get the full $1.8 billion from the PUC; he estimated that it was more probable that it would get $1.4 billion to $1.5 billion. PSNH in a rate case would seek return on equity that would attract stock investors at a price above book value.

There would be negotiations in a rate case with regard to future Seabrook operational contingencies even apart from the items regarding recovery of the costs of Seabrook. The negotiated rate plan has protection with regard to those future contingencies.

Robert C. Richards is an attorney and also holds PSNH common stock. He acted as attorney for the RKR objectors and also testified himself at the hearings. Richards was an attorney for the Long Island Lighting Company from 1971 to 1984. From 1984 to 1989 he was a member of the Strategic Planning Department and then the Financial Planning Department of LILCO during the time of construction of the troubled Shoreham nuclear power plant on Long Island. He has a B.A. in math from Yale University, a J.D. from Harvard University, and an MBA from New York University.

Richards testified that he believed that the company could get "much greater value" because of the New Hampshire law regarding recovering prudent investments; that the Bower–Rohr Report indicating a 31 percent increase plus inflation thereafter would be bearable should have been relied upon; and that alternatively PSNH could charge the NUSCO plan rates then continue thereafter with inflation for greater value. He argued that almost no burden has been imposed upon ratepayers under the new NUSCO plan since no rate increases occurred during the chapter 11 in 1988–89 and that rate levels will go down after 2000 A.D. under his analysis. He feels this is unfair. He testified that rates in 2001 and after would be less than the New England regional average.

Richards' basic argument revolves around his question of "who should pay for what the politicians in Massachusetts and New Hampshire did to PSNH?" He refers to the anti-CWIP law that drove up costs and was "a bet" that Seabrook would not run; that the investors won that bet so they should get the recovery regardless of the $6,000 to $7,000 KW capacity cost; and that the big cost in Seabrook was the interest cost and delay cost that should not have happened.[9]

Richards testified generally to these matters at the April 12, 1990 hearing. [Transcript, Court Document No. 3739, pp. 43–80, 202–210]

*Effects of RKR Proposal*

The RKR proposal assumes, according to witness Spann, $2.5 billion worth of debt. Spann here was dealing with the RKR alternative of a 31 percent initial increase followed by 4 percent per year after that. [Transcript, Court Document No. 3688, pp. 86–89] This would be 70 percent of the $3.6 billion value ascribed to the company under that proposal. This debt-equity ratio would be much higher than all but 4.7

---

9. It is true that $1.6 billion of the total $2.9 billion of PSNH's Seabrook cost is comprised of carrying charges.

percent of publicly-held companies *of all types* reported in the leading statistical publication. It is unheard of for a *utility* company.

The $2.5 billion debt instead of $1.6 billion debt under the plan would mean 50 percent higher fixed debt service costs. If the debt were only backed by Seabrook the reorganized company would have to pay higher interest costs according to Spann. The company would have a "razor-thin margin" if anything went wrong and would very likely be right back in the bankruptcy court if that occurred. Spann noted recent experiences with the Boston Edison Nuclear Power Plant involving considerable down-time of that plant. Spann expressed the view that the debt required under the RKR proposal would in effect be "contingent notes on the Seabrook performance for 20 years." Seabrook income *uninterrupted* would be essential to servicing a $2.5 billion debt for the reorganized company. The market would react accordingly so that even if the RKR rates were obtained from the NHPUC the debtor still would not realize the greater value due to the 70 percent debt-equity ratio.

Richards admitted that his proposal would not satisfy currently applicable accounting guidelines. He referred to his formula as "a phase-in to last for the entire life of the asset" referring to the projected 39 year expected life span of the Seabrook plant. Richards also admitted that his "present worth to annuity" concept and formula has not actually been used in any ratemaking case so far.

Questions by the Examiner brought out that the real impact of the depreciation and cost recovery approach put forth by Richards is in the later years, beyond the 10 year period testified to by Richards, and that you would really need to extend the projections considerably to see the actual effects of that proposal. There would be a very large deferred account that would have to be amortized in the future. [Transcript, Court Document No. 3739, pp. 121–125]

The RKR proposal also ignores the fact that stock investors look at net income and dividends and gives no real consideration to what happens to utility stock if the utility quits paying dividends because there are no retained earnings. The fact is the market price for the shares would drop. [Transcript, Court Document No. 3739, pp. 131–135]

Richards was asked how the company would finance new debt borrowings for ordinary operating purposes if it was showing losses or low earnings on its books until ultimately recovering through high rates in the future. Richards' response was that analysts would see big increases in rates coming and the company would be in good shape in a few years, i.e. there would be good cash flow but no earnings. [Transcript, Court Document No. 3739, pp. 191–192] As indicated above, however, this has never been actually accomplished in real world market conditions. Generally, the RKR objectors' contentions were presented as part of a highly theoretical construct. [Transcript, Court Document No. 3739, pp. 156–179]

### GAAP/FASB Accounting

In reporting the value of its investment in Seabrook PSNH was bound by Generally Accepted Accounting Principles ("G.A.A.P."). Historically PSNH had accounted for Seabrook in accordance with *Financial Accounting Standard No. 71* ("FAS–71"), promulgated by the Financial Accounting Standards Board ("FASB"), which sets forth the accounting principles and rules for regulated utilities. When a power plant is accounted for under FAS–71, the plant construction costs and an allowance for funds used during construction ("AFUDC"), which represents a reasonable return on both the debt and equity invested into the project, are added into the cost of the asset and capitalized on the utility's balance sheet. The premise for adding in AFUDC is the expectation that it will be recovered when the power plant goes into service. The standards for FAS–71 accounting require a utility to be: (1) subject to ratemaking by an independent regulatory body; (2) with ratemaking done on the basis of cost; (3) by a regulatory commis-

sion that is able to set rates than can be both billed and collected.

If a utility determines it no longer meets the criteria for FAS–71 accounting it must cease FAS–71 accounting for an asset and switch to traditional accounting analysis. When PSNH ceased FAS–71 accounting for Seabrook it reaccounted for the entire asset under traditional commercial accounting methods. PSNH removed all AFUDC from its valuation of Seabrook and replaced it with capitalized interest.

Under FAS–71 the company *had* to reverse its accounting for Seabrook in 1987, according to Wiggett, since PSNH could not recover the cost of Seabrook at rates that were collectable. FAS–71 also restricts any "phase-in" to require that those deferred costs must be recovered within 10 years. If the company can't recover them in 10 years, it has to write the value down and "you can't carry it as an asset." If a company goes off FAS–71 then it can no longer capitalize return on equity but it could continue to capitalize debt return i.e. interest.

The Financial Accounting Standards Board was created because "the SEC never did it" according to witness Herf. These are independent accounting experts who are supposed to provide a "due process procedure" before promulgating their accounting guidelines. The SEC adopts the FASB rules for registrants under their jurisdiction. There would also be ethical rule problems regarding a "clean statement" by a CPA auditing firm, if FASB guidelines were not met, pursuant to rules of the American Institute of Certified Public Accountants. A public company realistically needs such a CPA statement in order to sell securities. In the mid–1980s the FASB entity was concerned with the fact that "regulators were designing rate plans that pushed off cost recovery long into the future." Some utilities tried such schemes before the FASB promulgation but they went back to the PUCs to get rid of them

primarily because of Wall Street concerns rather than GAAP.

Herf testified that underwriters put heavy pressure on management to use GAAP. Herf further testified that all "sinking fund" devices make accountants nervous because the later year costs are usually higher and you have less years to recover those costs. With a nuclear power plant you commonly also have retrofitting expenses, and other unanticipated operational expenses, so you don't smooth out the costs as anticipated under a sinking fund device in actuality.

The utility industry fought the 10–year rule in the FASB hearings vigorously, but FASB concluded that "if you can't get it done in 10 years" the utility has substantial uncertainty regarding recoverability.

The RKR unconventional depreciation and cost recovery proposal would not be allowed under GAAP. Wiggett recognized the existence of unconventional theories regarding recovering of greater costs over a longer time—or other accounting approaches to depreciation involving excess cost plants—but that such theories were not realistic because the SEC in effect would freeze securities sales if such non-GAAP devices were employed. In his and Herf's view, as a practical matter, a company cannot be a *public* entity without GAAP accounting.[10]

### Other Seabrook Recoveries

Busch testified at length regarding UI's recovering of 57 percent of Seabrook—indicating it was actually more because of recovery of construction costs during construction. With regard to the Millstone Plant in Connecticut, NUSCO wrote off $110 million originally but the PUC ultimately forced a settlement involving a $400 million writeoff. The Examiner points out that the larger the dollar figures involved in an excess cost plant the higher the *percentage* write-down will be and that PSNH

10. Herf emphasized that uniquely in the regulated utility environment "you can drive revenue requirements by depreciation" and that this could have significant back-loading effects that is the basic reason for rejecting novel "econom-

ic depreciation" methods for such companies. Herf testified in great detail regarding GAAP and FASB accounting matters at the April 11, 1990 hearing. [Transcript, Court Document No. 3722, pp. 144–188, 194–205, 209–226]

had a larger share of Seabrook than UI or NUSCO. He notes that on a more appropriate KW capacity cost basis, in a survey of allowed nuclear power plant recoveries, the PSNH recovery under the plan is within the range of the other recoveries.

### Other Nuclear Plant Recoveries

There are no actual write-offs of 50 percent or more in recovery of nuclear power plant costs. Herf testified that he has studied nuclear plants having high costs of $4,000 KW capacity costs or over and having 900 MGW or over in size, and found nine plants in that category. However, he indicates there are a whole host of variables in that you cannot really predict from these cases the possible Seabrook writedown in a regulatory proceeding.

## VII. GENERAL CONCLUSION

The objections to confirmation by the RKR objectors on the basis that significantly greater rates and enterprise value could be obtained for the company by a litigated rate case, as opposed to the results obtained under the Rate Agreement embodied in the Plan of Reorganization, boil down to two essential points: (1) that except for a very small portion PSNH's expenditures in completing the Seabrook plant were all prudently incurred and therefore would justify *and require* NHPUC approval of full recovery of such prudently incurred costs under applicable statutory and constitutional requirements; and (2) that PSNH could ameliorate the "rate shock" effect of full recovery of such costs by employing a "phase-in" recovery *together with* recovery well beyond the 10–year period applicable under currently accepted accounting standards by the use of some imaginative though unconventional deferred cost recovery mechanisms.

With regard to the prudent investment recovery point, the objectors see this principle as a fixed star governing what the regulatory agency can do with regard to the recovery of costs associated with the Seabrook nuclear power plant, and argue further that the requirement is of constitutional dimension. The Supreme Court of the United States however has expressly declined to adopt prudent investment recovery as a constitutional standard. *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 619–20, 102 L.Ed.2d 646 (1989). The caution which all courts have exhibited in avoiding an exclusive focus on prudent investment as a cost recovery standard stems from the desire to avoid an unwarranted incentive for over-capacity generation by public utilities. See *Pierce*, "The Regulatory Treatment of Mistakes in Retrospect: Cancelled Plants and Excess Capacity", 132 U. of Pa.Law Review 497 (1984).

New Hampshire itself, in its statutory and regulatory framework, has both the "prudent" and a "used and useful" standard in this regard, undergirded by the ultimate "just and reasonable rates" statutory language provided in NH RSA 378:7. This legal framework for regulatory action is a far cry from the simplistic "prudence only" position put forward by the objectors. It obviously implies a balancing to cover both the initial analysis at the beginning of the plant construction as well as the ultimate effect of the plant coming on line at a particular time and at a particular cost.

The New Hampshire PUC and the New Hampshire Supreme Court gave ample warnings to PSNH in this regard in various rulings issued during the course of the Seabrook plant financing and construction. See, e.g., *Petition of Public Service Co. of New Hampshire*, 130 N.H. 265, 539 A.2d 263 (1988); *Appeal of Public Service Co. of New Hampshire*, 130 N.H. 748, 547 A.2d 269 (1988); *Re Public Service Co. of New Hampshire*, 70 N.H.P.U.C. 886, 904 (1985); *Re Public Service Co. of New Hampshire*, 68 N.H.P.U.C. 668, 670 (1983); *Re Public Service Co. of New Hampshire*, 67 N.H.P.U.C. 223, 231–32 (1982); *Re Public Service Co. of New Hampshire*, 67 N.H.P.U.C. 490, 525 (1982); *Re Public Service Co. of New Hampshire*, 65 N.H.P.U.C. 492, 493 (1980).

The New Hampshire Public Utilities Commission said clearly and unmistakably in 1985 in *Re Public Service Co. of New*

*Hampshire*, 66 PUR 4th 349, 70 NHPUC 164, 246, 247 (1985):

> If in a subsequent rate proceeding it is found that part of the capital investment in Seabrook I is imprudent so as to cause excessive and burdensome rates not economically justified, the Commission may disallow part of the Seabrook investment.

> \* \* \* \* \* \*

> While there are constitutional guarantees of the opportunity to earn a fair return, rates may not be "prohibitive, exorbitant, or unduly burdensome to the public." ([*State of Missouri v. Public Service Comm.*] 262 U.S. [276] at p. 290, footnote 2 [43 S.Ct. 544, 547 n. 2, 67 L.Ed. 981 (1923)], PUR1923C [193] at p. 201, footnote 2.) The essential reconciliation of prudent investment and reasonable, not unduly burdensome rates may be accomplished in a rate proceeding when PSNH seeks rate support for the addition of Seabrook to its rate base. A prudency investigation should be initiated by the Commission on a timely basis to assure an in-depth analysis of prudent investment and the reasonable rate level for a fair return to investors without unduly burdening ratepayers.

Similarly, in *Appeal of Public Service of New Hampshire*, 122 N.H. 1062, 1076, 454 A.2d 435 (1982) the New Hampshire Supreme Court stated:

> Thus, while management in the first instance may be free generally to make its own decisions about its level of investment in new construction, *see Appeal of Legislative Utility Consumers' Council*, 120 N.H. 173, 175, 412 A.2d 738, 739 (1980), it must bear in mind that as a regulated company not *all* costs may be recovered from the public when the plant is completed.

> A vested right to build is not a vested right to have customers pay. PSNH itself agrees that the PUC may reject management decisions "[w]hen inefficiency, improvidence, economic waste, abuse of discretion, or action inimical to the public interest are shown." *Re Public Service Company of New Hamp-*

*shire*, 62 N.H.P.U.C. 83, 92, *aff'd, Legislative Util. Consumers' Council v. Public Util. Com.*, 117 N.H. 972, 380 A.2d 1083 (1977).

And, again, in 1986, the New Hampshire Supreme Court explained in *Appeal of Conservation Law Foundation of New England, Inc.*, 127 N.H. 606, 637–38, 647, 507 A.2d 652 (1986):

> [T]he principles of prudence and usefulness ... are significantly different in at least one respect that is of great potential significance for the treatment of Unit I costs. While prudence judges an investment or expenditure in the light of what due care required at the time an investment or expenditure was planned and made, usefulness judges its value at the time its reflection in the rate base is under consideration. Under the "used and useful" principle, the commission is not asked to second-guess what was reasonable at some time in the past, but rather to determine what can reasonably be done now with the fruits of investment. It is therefore not surprising that the commission's flexibility in applying the usefulness principle extends to judgments about the inclusion or not of investment in property held for future use. *See LUCC [v. Public Serv. Co. of N.H.]*, 119 N.H. [332] at 343–44, 402 A.2d [626] at 633–34; *N.H. Gas & Elec.*, 88 N.H. [50] at 55, 184 A. [602] at 605 [1936]; C. PHILIPS, Jr., *supra* at 316.

> \* \* \* \* \* \*

> [I]t is important to bear in mind, as Commissioner Aeschliman's separate opinion indicates, that the principle of used and useful property will also be applicable in determining rate base. In the face of rate issues that are unparalleled in the State's history, we should recall that the usefulness principle lends itself to development over time and under new conditions ... We therefore attend seriously to the suggestions of the separate opinion, that the burden of excess capacity that may be created by such giant projects may appropriately be shared as between investors and customers ..., and that the usefulness principle

may be applied to effect such a shared allocation. (Citations omitted.)

The legitimate ratemaking expectations of PSNH and its investors under New Hampshire law are summed up in the decision in *Petition of Public Service Co. of New Hampshire*, 130 N.H. 265, 280, 539 A.2d 263 (1988) as follows:

> Any vested right which the company [had] when it commenced construction was a right to the constitutional guarantees of [*Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)]; namely, "just and reasonable rates" based in part upon property used and useful in the generation of electricity. This right exists today. It has not been taken away by the anti-CWIP law. Neither the company nor its investors had a vested right to the economic status quo at the time of the investment decision. Such matters as increasing costs, inflation, high interest rates, conservation, the OPEC cartel, and the myriad of other factors affecting business judgment are the concerns of the free market and its forces which ultimately fall upon management to assess. Not all management decisions are reviewable or subject to cure in the judiciary.

It should also be remembered that New Hampshire is a state that does *not* have a statutory framework which requires *prior* PUC approval for power plants to be constructed by its regulated utilities. PSNH itself decided to build the Seabrook plant and decided to continue to build that plant even after the costs skyrocketed for various reasons.

The Supreme Court of the United States has indicated in dicta that a "shift in methodologies" by a state regulatory agency in midstream with regard to the construction of a regulated utility plant might present a question of constitutional due process violation as a "taking" if shown. See *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 109 S.Ct. 609, 619, 102 L.Ed.2d 646 (1989) ("The risks a utility faces are in large part defined by the rate methodology because utilities are virtually always public monopolies dealing in an essential service, and so relatively immune to the usual market risks. Consequently, a State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments at some times while denying them the benefit of good investments at others would raise serious constitutional questions."). In the present case the Court inquired as to whether the objectors could show any such shift in ratemaking methodologies on the part of the New Hampshire which might present a basis for constitutionally-required full recovery of Seabrook costs but in my judgment the objectors were unable to point to any such shift.

This Court does not need to determine for present purposes whether PSNH in a litigated rate case could not obtain some additional rate increases and value for the company but simply whether there is a substantial basis for the expectation voiced by the objectors that such a proceeding would result in recovery of anything close to full cost recovery for the Seabrook plant. It may well be, as objectors argue, that it would be shown in such a proceeding that only a small fraction of the Seabrook construction costs could be considered imprudent in the sense of mismanagement, negligence, or wasteful construction activity. But that cramped view of the "prudence" concept no longer can be assumed to be a controlling factor in the current regulatory ratemaking process.

The concepts of "prudency" and "used and useful" according to the record before me, and the applicable case law, are evolving concepts that regulators are using to effectuate an appropriate balance in the sharing of costs associated with excess cost power plants between ratepayers and investors. In other words, it is at least arguable, notwithstanding the best management and control of costs in the actual construction of a plant, that the decision to go forward with the construction and completion of the plant may be deemed imprudent if it will result in a power plant coming on line with electricity too expensive to be used at the high rates necessitated by

full recovery of the associated construction costs. Cf. *In re Western Massachusetts Electric Co.*, 80 PUR 4th 479, 542 (Mass.D. P.U.1986). The same broadened meaning of the "used and useful" concept could also arguably can be applied to effectuate a sharing of costs of such a plant, as indicated in the New Hampshire decisions cited above. The very concept of excess capacity *created by a plant too expensive for customers to use* is a phenomenon largely attributable to the experience in recent years of massive cost overruns with regard to nuclear power plants.[11]

Even apart from any effect that the 1987 write-down might have in a rate case, the record before me independently establishes that it would be unlikely that PSNH could recover appreciably more than $1.8 billion in recovery of Seabrook costs in a litigated rate case, and that it is quite uncertain whether even the $1.8 billion is realistically achievable. This record emphatically establishes PSNH in a litigated rate case would have to face vigorous and sustained opposition by the State of New Hampshire, together with various active citizen groups opposing Seabrook and its associated costs.

The argument would be made that at some point in the late 1970s and early 1980s it had to be obvious to PSNH management that the kilowatt capacity costs and charge rates per kilowatt hour attributable to full recovery of the Seabrook construction and completion costs were going out of sight; that the company had numerous warnings from the NHPUC and the New Hampshire Supreme Court regarding the ultimate balancing that would have to be done in determining the reasonable rates for the company; that the GAAP accounting realities would limit any phase-in and deferral of costs to a 10-year maximum period; and that at a total cost recovery level the *collectable* rates that could be charged and recovered in the real

world simply would not support full recovery of the Seabrook investment.

If it were assumed for present purposes that PSNH could establish in a litigated rate case that it was "entitled" to full recovery of its Seabrook investment, under current ratemaking principles, the record does not indicate any likelihood that such costs could be recovered out of rates within a time frame permissible under current accounting and regulatory policies. The evidence is uniform that under current accounting standards and practices no regulated utility has been able to show as current assets on its financial statements any assets whose costs could not be recovered in a 10-year period.

While the RKR objectors have put forward interesting and imaginative arguments and theories as to why GAAP principles and the FAS-71 requirement should be disregarded in this context, to permit greater recovery over a longer time period of the Seabrook costs, that accounting approach admittedly is unconventional and has not been used by any utility or regulatory agency to date. If such an unconventional approach is to be established it probably will require a strong, highly solvent utility with the necessary financial staying power to litigate the matter in a regulatory proceeding and associated appeals for the time necessary to overturn the current accounting and regulatory practices in that regard. PSNH simply is not in that strong financial position and therefore this Court cannot find a reasonable likelihood that if it denied confirmation of the pending Plan the company in fact would achieve the "breakthrough" in current practices that the objectors desire.

Moreover, regardless of a successful result in a regulatory proceeding, to adopt unconventional cost recovery and accounting practices with regard to the Seabrook plant, there still remains the "real world"

---

11. The phenomenon was recognized however in other contexts as early as 1949 by the New Hampshire Supreme Court as noted in *In re New England Telephone & Telegraph Co. v. State,* 95 N.H. 353, 360, 64 A.2d 9 (1949), "If as the report of the Commission implies, construction undertaken by the [c]ompany is 'wasteful'

*or its expense is unwarranted by the demand probable at the necessary price for service produced by it,* ... unwarranted investments may be excluded from rate base, and unjustified expenditures from the determination of a reasonable return." (Emphasis added)

effect of such practices in terms of reaction by the financial markets and utility analysts who would be essential to the issuance of future securities and public debt necessary, not only for the initial cash requirements of a reorganization plan, but also necessary to finance the reorganized company's ongoing operations. The record before me is replete with various question marks and uncertainties as to the market reaction in that regard that could interject into any renewed reorganization plan proceedings a significant question of feasibility in terms of such necessary financing and access to the capital markets in that context.

Finally, it has to be recognized that while the Court for present purposes has to balance various "likelihoods" in making a surface determination as to whether the plan compromise is fair and equitable, and a better result than could be obtained in a litigated rate case, the one thing that is *not* uncertain is the inexorable accruing of further massive amounts of additional claims by the senior interests above the common stockholders during the period of delay necessary to achieve the greater value in a litigated rate case. It is the *net* result that is crucial to the equation in evaluating the position of the common stockholders. In my judgment it is likely that it would take approximately three years to get through the 18–month NHPUC process and the inevitable appeals in the New Hampshire Supreme Court and the United States Supreme Court. However, even if it were assumed that the novel position espoused by the RKR objectors could be established in only two years, that lesser period of delay still would result in such substantial additional obligations ahead of the common stockholders that it would be very unlikely that the net result of value flowing down to the common stockholders would be appreciably greater than that presently available under the confirmed plan of reorganization.[12]

Accordingly, for all the reasons indicated above, the Court concludes that the Rate Agreement compromise embodied in the Plan of Reorganization is within the range of expectable results from a litigated rate case and is in fact fair and equitable in the circumstances; and furthermore that the Plan does not violate the provisions of Section 1129(a)(7) of the Bankruptcy Code in that the class to which the objecting common stockholders belong would not in any event achieve a greater recovery if the Plan is denied confirmation and the case proceeded under chapter 7 of the Code.

### APPENDIX

MEMORANDUM OF THE STATE OF NEW HAMPSHIRE REGARDING THE UTILITY RATEMAKING PROCESS

(Docket No. 3572—Filed April 11, 1990)
### EXTRACTS

The State of New Hampshire submits this Memorandum in response to the request of the Court made at the hearing held on April 5, 1990, relating to the proposed confirmation of the Third Amended Joint Plan of Reorganization filed by Northeast Utilities Service Company, et al.

\*　　　\*　　　\*

I. *Nature and Role of PUC in Ratemaking*

No public utility is permitted to charge any amount for any service except as provided in its tariff on public file at the Commission. At its most basic, then, a rate proceeding is a process by which the Commission approves changes in tariff provisions.

The New Hampshire Supreme Court has characterized tariff provisions as involving more than contractual obligations of the utility and its customers. Tariff provisions have the "force of law". See *Appeal of Pennichuck Water Works*, 120 N.H. 562,

---

**12.** During their oral argument on this matter counsel for the Creditors Committee stated that for the creditor group itself the company would "need to get a homerun in the Seabrook rate case to cover us" when the costs of delay are considered. Counsel for the Equity Committee amended that by noting that "the numbers are so large, you don't have to hit a homerun, you have to hit a grand slam...."

566 [419 A.2d 1080] (1980). In that same case, the Supreme Court characterized the nature of the PUC's action in setting rates as "essentially a legislative function." As a result, tariff provisions are subject to the limitations of Part 1, Article 23 of the New Hampshire Constitution prohibiting retrospective laws. *Ibid.* pp. 565–66 [419 A.2d 1080].

Although this function is "legislative", the PUC is, nonetheless, an agency constituted within the executive branch of State government. The Commissioners are appointed by the Governor and Council and the rulemaking and adjudicatory proceedings of the Commission are governed by the State Administrative Procedure Act, RSA Chapter 541–A and due process requirements of the New Hampshire Constitution. See *Appeal of Concord Steam Corp.*, 130 N.H. 422 [543 A.2d 905] (1988).

\* \* \*

## II. *Description of PUC Rate Proceedings*

\* \* \*

The PUC's tariff filing rules are contained at New Hampshire Admin.Rules, PUC 1601.1–1603.09. These rules require the utility commencing a rate case to provide not less than thirty nor more than sixty days' notice to the Commission. The filing requirements for such a case require the utility essentially to file its direct case with the request for an increase in rates, together with numerous additional items. While the filing requirements are substantial, they are intended to avoid delay by requiring the utility to file at the outset those items which would almost certainly be obtained later in the case through discovery.

Once the utility makes the necessary filing, including revised tariff pages, the PUC must determine within thirty days whether to allow the tariff change to become effective or to suspend the effectiveness of the tariff revision pending investigation by the Commission RSA 378:6. Obviously, unless the change is *de minimis*, the Commission take the latter course. The Commission will then issue an Order of Notice setting the matter for a pre-hearing conference.

At the pre-hearing conference, a procedural schedule is set and a first effort is undertaken at narrowing the issues for decision. Discovery generally proceeds in the form of data requests, which are interrogatories and requests for the production of documents. The number of data requests will vary depending on how complex and how controversial the issues of the case may be. In a straightforward case where the utility has fully complied with the tariff filing requirements, the number of data requests may be fairly limited. However, the number of data requests can be substantial. For instance, in the pending rate proceeding involving New England Telephone and Telegraph Company, DR 89–010, the number of data requests addressed to New England Telephone from the Commission staff and the other parties to the case has numbered in excess of 1,400. It is certainly safe to assume that the number of data requests in a case involving an adjudication of the prudence of expenditures for Seabrook would generate a substantial amount of data requests.

The procedural schedule will call for the pre-filing of testimony by the participants in the proceeding including, in addition to the petitioning utility, intervenors and staff. The schedule may also accommodate rebuttal testimony. Each instance of the filing of testimony will be followed by a period for discovery with respect to that testimony. One or more conferences among the parties and the Commission staff are generally held for the purpose of discussing the potential for settlement and at a minimum narrowing the issues to be litigated. Finally, hearings are held before the Commission. If there are matters which have been settled, those matters are presented for approval by the Commission. Matters which have not been settled or which are the subject of settlement agreements that are not approved by the Commission are adjudicated in the hearing process.

Under RSA 378:6, the Commission's final decision on permanent rates must be made within one year following the rate case filing, except in the instance of an addition to rate base which exceeds 50 percent of

the utility's existing capital investment, in which case the decision must be rendered within 18 months. This decision can be appealed pursuant to RSA Chapter 541; there are no statutory time limit on action by the Supreme Court or by the PUC on remand.

Under RSA 378:27, the Commission is authorized to approve temporary rates pending the final decision. Generally, temporary rate orders allow for increases or decreases with respect to items which appear from a preliminary review of the rate case filing to be likely to be allowed in any event. If the rate increase allowed in the permanent rate order at the end of the case provides for an increase in excess of what has been allowed in temporary rates, the utility is permitted to recoup the difference between what it would have charged had it had rates during the temporary rate period been set at the permanent rate level and what was actually charged. This amount is normally collected over time in the form of a surcharge. Similarly, if the permanent rate order results in rates that are lower than the temporary rates, the difference in levels for the period of the temporary rates must be refunded by the utility to customers in the manner directed by the Commission.

If temporary rates are not allowed, the utility is permitted to place the entire amount of the rate increase into effect under bond six months after the originally proposed effective date of the tariff pursuant to RSA 378:6. If the rate increase allowed in a permanent rate order is less than this full amount, the difference between the amount collected under bond and the amount which would have been recovered at the permanent rate level must be refunded to customers.

### III. *The Ratemaking Formula*

#### A. In General

The basic ratemaking formula has been described by the New Hampshire Supreme Court in the case of *Appeal of Conservation Law Foundation*, 127 N.H. [606] 633–648 [507 A.2d 652] (1986). Basically, the utility is permitted to earn a reasonable rate of return on amounts prudently expended for property used and useful in providing service to the public after allowable expenses. This amount is the "revenue requirement" of the public utility.

The determination of the revenue requirement is made by examining the financial performance of the utility during a historical period and extrapolating therefrom the likely future financial performance of the utility. The historical period selected is called "test year." The Commission will examine the expenses incurred during that test year, the amount invested in capitalized assets (the "rate base"), and the return earned by the utility. *See Appeal of Public Service Company of New Hampshire*, 130 N.H. 748, 758 [547 A.2d 269] (1988); *New England Tel. & Tel. Co. v. State*, 113 N.H. 92, 95–96 [302 A.2d 814] (1973).

#### B. The "Rate Base"

Amounts included in rate base consist primarily of amounts invested in items of real and personal property used in the utility business less accumulated depreciation. For electric utilities, these items include primarily generating stations, substations, transmission lines, distribution lines and various office and other types of buildings used in providing electric service. With respect to items which are allowed to be included in rate base, the utility is permitted to receive a return "of" and "on" amounts invested in those assets. The return "of" the investment is provided in the form of an allowance of depreciation or amortization as an expense. The return "on" those items is provided through the allowance of the rate of return on the unamortized balance.

In addition to costs associated with physical property, certain expenditures by the utility which warrant recovery over a period of longer than one year are capitalized and amortized over a longer period. The requirement to capitalize such amounts and the amortization periods may be prescribed within the Commission's Uniform System of Accounts or by specific Commission order.

The rate base will usually also include a working capital allowance to provide investors with a return on fund made available by the utility to pay expenses before revenues to cover such expenses are recovered from customers.

Whether an item will be permitted to be included in rate base will depend on whether and to what extent expenditures were "prudently incurred" and whether the resulting asset is "used and useful" in providing service to the public.

\* \* \*

In measuring rate base, the New Hampshire PUC has generally used a rate base which is averaged over the entire test period as opposed to looking at account balances as they exist on any single date.

Because the nature of the process is to take a historical period and project from it future results, the PUC will also take into account certain known and measurable changes. Accordingly, if there have been substantial changes in the rate base which will definitely affect future financial results, these known and measurable changes may be reflected. The inclusion of such changes, however, is tempered by the "matching" requirement, namely, the requirement to match expenses with revenues. Many times new investment will result in new revenues. Therefore, care is taken to make sure that the reflection of known and measurable changes does not have the effect of overstating or understating the likely effect of the change on ultimate operating income. *See Appeal of Manchester Gas Co.*, 129 N.H. 800, 806 [533 A.2d 366] (1987).

The rate base is also adjusted to reflect certain deferred taxes. See *Appeal of Public Service Company of New Hampshire*, 130 N.H. 748, 757–60 [547 A.2d 269] (1988).

## C. Expenses

The Commission will also look in detail at expenses which are included within the test year. Expenses will be excluded for ratemaking purposes where they have been imprudently incurred or where they are incurred for non-utility purposes or are otherwise unnecessary for the conduct of the company's utility business. Expense amounts will also be adjusted for known and measurable changes. New expenses which are likely to be experienced prospectively may be included as pro-forma adjustments to the test year expense amounts. Expenses which are not likely to recur will be correspondingly excluded.

Based upon the foregoing analysis, the Commission will determine a pro-forma rate base and the pro-forma expense level that will be used in determining the revenue requirement.

Generally, then, items included in test year expenses are recovered through rates in current annual revenues. There is a recovery "of" these amounts, but because they are recovered currently, the ratemaking process does not provide a return "on" these amounts (other than indirectly to a certain extent through the working capital allowance). This is in contrast with rate base amounts which are recovered over a longer period with a return being provided on the unamortized balance.

## E. Return

Next in the analysis is the determination of the allowed rate of return. The allowed rate of return allowed is required to be not less than the utility's cost of capital. The cost of debt capital is a matter which can be readily determined based upon the interest rate of the debt and the amortization of any issuance expenses, premium and discount. The same is substantially true for any preferred stock which the utility may have outstanding, the terms of which will be established by the utility's Articles of Incorporation. The more difficult matter is the determination of the cost of common equity. This determination will involve the testimony of experts. The Commission in recent years has generally followed a discounted cash flow analysis in determining the cost of common equity. The Commission may also consider the "risk premium" approach, the "capital asset pricing model" and other methodologies. *See* Morin, Roger, *Utilities Cost of Capital*, Public Utility

Reports, Inc., 1984; Gordon, Myron J., *The Cost of Capital to a Public Utility*, MSU Public Utility Studies, 1974; Kolbe, A. Lawrence, et al. *The Cost of Capital—Estimating the Rate of Return for Public Utilities*, MIT Press, Cambridge, Mass. 1984; Philips, Charles F., Jr., *The Regulation of Public Utilities*, 2d Ed., Part II (Theory of Public Utility Regulation), Public Utility Reports, Inc., 1988. *See* also *Appeal of Public Service Company of New Hampshire*, 130 N.H. at 751–57 [547 A.2d 269].

Based on this analysis, the cost of each component of capital is determined and weighted in accordance with the proportion of that component to the total amount of capital. The Commission may also look at whether the utility's capital structure is appropriate. In doing so, the Commission will examine whether the capital structure provides the utility with sufficient strength to withstand potential economic adversity and to have access to the capital markets in order to raise the funds necessary to invest in plant necessary to meet the requirements of service to the public. The Commission may also look at the economic efficiency of the capital structure. Among the factors the Commission will consider are the costs savings which can result from debt capital through the deductibility for tax purposes of interest payments. However, the Commission will also consider the impact of the risks associated with leverage on the cost of debt and equity capital. Generally, the Commission will be looking to a capital structure which provides long-term strength for the utility and which is likely to produce the lowest overall cost of capital in the long run. In an appropriate case, the Commission may determine the allowed rate of return on the basis of an imputed capital structure rather than actual capital structure recorded rather than the actual capital structure recorded on the utility's books of account. See, *Appeal of Conservation Law Foundation*, 127 N.H. at 635–36 [507 A.2d 652]; *New England Tel. & Tel. Co. v. State*, 98 N.H. 211, 200 [97 A.2d 213] (1953).

An additional factor which may be reflected in the return is an "attrition" allowance. This kind of an allowance is more traditionally included in an environment of high inflation, where the simple fact of inflation is likely to result in a failure of the utility to earn its allowed rate of return on a go-forward basis even if the utility performs exactly or contemplated in the pro forma test year calculation. Other arguments with respect to potential attrition in specific areas and its ratemaking treatment may also be made.

F.   Calculation of Required Increase

The Commission next compares the pro-forma net operating income of the utility for the test period with the amount which results from the multiplication of the rate base times the allowed percentage rate of return. If the pro-forma net operating income is less, the amount by which it is less is the "revenue deficiency" to be recovered through increased rates. If the utility is a private corporation required to pay income taxes, the deficiency will be grossed up for the amounts by which the rate increase will necessarily increase the expenses for federal and state income taxes (including the State franchise tax imposed under RSA 83–C). This deficiency, grossed up for the tax effect, is the amount of the required rate increase.

The Commission then determines the rate classes from which the increase will be collected in the manner described in more detail in the Prior Memorandum [filed by State of New Hampshire on March 8, 1988, Docket No. 337, at Court request discussing NHPUC regulation].